Filed 7/28/23  In re D.E. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re D.E., et al., Persons Coming Under the Juvenile Court Law. | |
| | D081744 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. NJ15881AB) |
| Plaintiff and Respondent, | |
| v. | |
| R.R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Liana Serobian, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

After finding it true that nine-year-old D.E. and seven-year-old A.E. had been exposed to ongoing domestic violence between their parents, the juvenile court removed the children from both parents, placed them with their maternal grandparents, and ordered liberal, supervised visits for R.R. (Mother).[1] Mother did not request any specific visitation order but asked the court to continue to vest the San Diego County Health and Human Services Agency (Agency) with discretion to expand her visits. The court did so and granted the Agency discretion to lift supervision of Mother's visits, as well as to allow Mother to have overnight visits and live in the grandparents' home with the children.

Mother challenges the dispositional order, on two grounds: First, she asserts substantial evidence did not support the juvenile court's removal order because reasonable alternatives existed to prevent the children's removal from her custody. Alternatively, she asserts the court's visitation order was erroneous because it set no minimum frequency or duration for Mother's visits and improperly delegated "all judicial authority" to the Agency over Mother's visits. We conclude the record provides substantial evidence to support the court's removal order and Mother forfeited her claim regarding the visitation order. As a result, we affirm the court's jurisdictional and dispositional orders.

---

[1] T.E. (Father) is not a party to this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

*Dependency Petitions*

In October 2022, the Agency filed dependency petitions on behalf of D.E. and A.E., each alleging Mother and Father failed to protect the children from exposure to the parents' ongoing domestic violence, pursuant to Welfare and Institutions Code section 300, subdivision (b).[2] The Agency's investigation revealed the following facts.[3]

On August 9, 2022, police officers responded to the family's home when J.R. (Maternal Grandmother) reported domestic violence had occurred in the home. Mother told the officers Father threatened to break her cellphone, pushed her two times, and threw a roll of pennies at her, striking her in the chest. She had slight bruising to her right wrist and right breast. According to Maternal Grandmother, Father did break the cellphone. While officers were speaking with Mother, Father fled the home and later forcefully resisted arrest and tried to kick one of the officers. He was arrested for corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)) and resisting arrest with force (Pen. Code, § 69). The children were at a nearby park during the incident but saw officers arrest Father.

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

[3] "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

On August 12, 2022, a three-year criminal protective order (CPO) was issued. It prohibited Father from contacting Mother or coming within 100 yards of her, as well as her home, employment, or vehicle.

Maternal Grandmother was caring for the children on the weekends as a result of the August 9, 2022 domestic violence. On August 22, Maternal Grandmother reported she encountered Father at Mother's home when she dropped off the children, in violation of the CPO. Because Mother was not at home, she left the children in Father's care. Maternal Grandmother told the Agency Father was a "heavy drinker" and she believed "the majority" of the parents' domestic violence occurred when Father was intoxicated.

On September 27, 2022, the parents engaged in another violent incident, eight days after both had declined voluntary services to address domestic violence in their relationship. This time Father threw a glass plate at Mother, cutting her arm. When the police responded, Mother lied to officers that Father was not in the home; they found him and arrested him for violating the CPO. Mother had three small bruises on her arm and a scratch on her wrist. She told the officers she received the injuries from "tripping" over tools.[4] Mother eventually told the officers she had invited Father to the home to help move furniture after a pipe burst in her home. She did not want the CPO, nor did she want Father to be prosecuted for violating the CPO. She said she intended to go to court to "remove" the CPO.

Both children were present during the September 27, 2022 domestic violence. D.E. reported to the Agency that her parents " 'got into a fight' " because her " 'dad thinks [her] mom is cheating on him.' " Father then threw

---

[4] A month later, Mother told the Agency Father angrily threw a plate at her and that it would have hit her face but she blocked it with her arm. She went to the hospital because she believed her wrist was broken.

4

a glass plate " 'on the ground.' " She said, " 'When he gets mad, he likes to throw things.' " D.E. reported her " 'mom had a cut on her wrist and it hit a nerve and [her] dad got a cut on his thumb.' " Since then, Father has called Mother " 'a few times,' " telling her " 'he misses her and he is tired.' " Mother responded by " 'asking when he was coming back home.' " D.E. said she was afraid when her parents fight and explained, " 'My grandma's house is the only peaceful place I am in.' " A.E. reported that he " 'heard a glass break' " and when Father left, he saw the glass on the ground. A.E. said what happened made him feel " 'not so good' " and when asked how his parents fight, he responded, " 'They fight.' "

Father, who was in custody, told the Agency he was not at the home on September 27, 2022 and denied any domestic violence had occurred with Mother. He denied "know[ing] anything about a plate." He saw that Mother had "a cast" on because she had a cut on her arm, although he did not know how she was cut. The Agency spoke to him again more than a week later and told him "various people" had reported to the Agency about the September 27 domestic violence. In response, Father asked if Mother was one of the people. Father then told the Agency "everything" it was told " 'was true.' " He claimed, however, Mother " 'attacked him' " because she was mad that he had told D.E. about Mother's boyfriend. She grabbed a shoe and threw it at him, and he reacted by throwing a plate at her. He admitted he was in violation of the CPO.

The parents had a documented history of domestic violence. Mother told the Agency she had called the police twice in the past because of "verbal arguments," " 'nothing crazy.' " She denied the arguments were "physical," and explained they were "just more 'rowdy.' " The Agency obtained two police reports of domestic violence occurring on November 15, 2020 and December

5

1, 2021. On November 15, 2020, Mother called the police because Father spat twice in her face, grabbed her left arm and "flung her onto the bed," and choked her with his hands. She was not able to breathe. Officers observed she had an abrasion to her left wrist. Mother did not want Father prosecuted. On December 1, 2021, Mother reported Father took money from her purse so she punched him twice in the forearm. Father then pushed Mother twice, causing her to fall back onto the couch and floor, and pulled a "clump" of hair from her head. Officers saw redness to her back and the clump of hair on the ground. Mother told the officers she had been in " 'four or five' total domestic violence incidents" with Father.

## II.

### *Detention Hearing*

At the detention hearing in October 2022, the juvenile court made a prima facie finding on the petitions, detained D.E. and A.E. with the maternal grandparents, and ordered liberal but separate, supervised visits for Mother and Father. It vested the Agency with discretion to lift supervision and allow the parents to have unsupervised and overnight visits, and to detain the children with the parents with the agreement of the children's counsel. The court also gave the Agency discretion to allow Mother to reside in the maternal grandparents' home with the children, with the agreement of the children's counsel. The court ordered reunification services for Mother and Father, including domestic violence treatment and parenting classes, and referred them to a substance abuse specialist for evaluation. It also authorized therapy for the children

## III.

*Jurisdictional and Dispositional Hearing*

The contested jurisdictional and dispositional hearing was held on February 10, 2023. While Maternal Grandmother was present, neither parent attended the hearing. The court clerk attempted to call Mother and Father but reached an out-of-service message for each. Counsel for Mother requested a continuance so Mother could attend. Noting that Mother's last appearance was in October 2022, the juvenile court found Mother had received proper notice of the hearing and denied the continuance request.

The juvenile court received into evidence the Agency's reports to date from the filing of the petitions. The Agency's social worker was present to testify, but counsel for Mother and Father chose to not cross-examine her, nor did they present any affirmative evidence. The court found the petitions true by clear and convincing evidence and assumed dependency jurisdiction over the children. It then found the requirements of section 361, subdivision (c)(1), had been met by clear and convincing evidence and removed D.E. and A.E. from each parent. It ordered the children be placed with relatives and continued all prior orders, including its order granting Mother liberal supervised visitation with discretion to the Agency to expand the terms of her visitation.

In addition to what we have already summarized, the Agency's reports provided the court with the following additional facts to support its jurisdictional and dispositional findings and orders:

A. *The Children's Progress*

D.E. had been demonstrating anxious behavior, including picking at her nails. She asked to talk with someone because "she had been feeling

7

more sad than usual." She explained "she would see hitting" when her parents fought and she felt unsafe to be with them, even if they separated.

A.E. tended to become "extremely angry" and had "difficulty calming himself down." On one occasion, he scratched Maternal Grandmother when she tried to calm him. He reported "feeling sadder than usual because he miss[ed] his parents" and said things "as if he wants to die." Maternal Grandmother reported he was saying " 'crazy stuff" like 'I wish I was dead,' " and would get "extremely angry very quickly." A.E. reported, " 'My dad always hurt my mom, he's not safe around us. I saw him kicking her.' " He felt safe with his parents but only if they separated. If he had a magic wand to change anything, he said it would be to " '[m]ake my parents not fight anymore.' "

B.    *Father's Progress*

Father was living in a car that his grandmother had lent him. He had not started his domestic violence classes, counseling, or substance abuse services. Although the children clearly enjoyed their supervised time with Father, he was inconsistent. He had multiple missed visits and provided late notice to the Agency, all of which caused the children to become "distraught."

Father acknowledged he committed domestic violence against Mother. He explained he and Mother would hit each other and he had strangled Mother once. But in his view, Mother was the antagonist who usually started the physical altercations. He reported the domestic violence had only recently started the past two years. He believed the children were usually outside playing or in their room during the domestic violence, but when asked if the children would hide during any incident, he responded, " 'I guess so.' "

Father denied he and Mother were in contact and asserted he was complying with the CPO. Father denied he had an alcohol dependency

8

problem, although he admitted he was charged with driving under the influence three times over the last 10 years. He explained he would drink "for a week straight" when he was depressed to " 'take the edge off.' " Father denied the domestic violence with Mother resulted from his drinking.

C.    *Mother's Progress*

Mother had enrolled in her domestic violence services but, for reasons not her fault, the classes began late (in January 2023) and her first class was cancelled. Mother did not have stable housing and was apparently staying in the homes of various friends.

Like Father, Mother had also been inconsistent with her visits with the children. Although she "had significant opportunities to fully parent [them] given that she conduct[ed] almost all of her visits in the maternal grandmother's home," Maternal Grandmother reported to the Agency that she was "minimal in her interactions with the children, often late to visits, and often does not show up for her visits." Mother explained she had been skipping visits because she was struggling with " 'a lot of emotions.' "

Mother reported the domestic violence started five years ago in her 10-year relationship with Father and "it was mostly verbal altercations." She acknowledged there had been "pushing" and "shoving" but described it as " 'rough housing, being too rough.' " Father has hit and kicked her but "that was years ago" and he also strangled her once. Later she said Father had choked her at least twice and left her neck sore for "2-3 weeks" and she felt like "it 'messed up [her] vocal cords.' " Mother believed the domestic violence resulted from their inability " 'to control [their] emotions' " and the fights were over infidelity and "deep trust issues." She denied starting the physical altercations and explained she would only shove Father back "in defense." Mother loved Father but acknowledged "the fights were getting worse." She

9

admitted she and Father sometimes drank together and "it would get even worse."

D.    *Reported CPO Violations*

On November 15, 2022, Maternal Grandmother called the police because Father was seen across the street going into her apartment complex. Maternal Grandmother told the Agency that whenever Father called or texted, Mother would "always" text or call a few seconds later; she found the timing "strange." She told the Agency she was upset by Mother's behavior and not sure if Mother should continue to have visits with the children in her home.

On February 1, 2023, Maternal Grandmother reported that although "things [had been] going well" with Mother, she suspected Mother was seeing Father again. She explained Mother had become "very inconsistent" with her visits with the children and felt " 'something shady [wa]s going on.' " Mother had been staying with friends and was usually dropped off "right in front of the driveway" at her home when visiting the children. But now, Mother was walking down the street to be picked up. Maternal Grandmother checked her "Ring" surveillance camera and saw an older white Toyota Rav-4. This car had picked up Mother "multiple times" and she suspected it was Father. Maternal Grandmother reported that Mother was " 'coming and going at weird times, she's not cooking now, the routine is not as consistent' " and she had to monitor Mother to " 'keep[ ] the kids on track.' "

On February 6, 2023, just four days before the contested hearing, Maternal Grandmother reported that Ra.R. (Maternal Aunt) told her she just saw Mother and Father walking together. Maternal Grandmother knew Father parked near an old apartment complex they used to live at and went to investigate. When she drove up to the complex, Maternal Grandmother

10

saw Father sitting in a white Toyota Rav-4, the same vehicle she had seen on her "Ring" surveillance camera. She did not see Mother in the car, but "assumed" she was probably hiding or had left.

Maternal Aunt confirmed she saw Mother and Father walking "arm-in-arm" on the side of the road as she was driving to Maternal Grandmother's home on February 6, 2023. She was "100% sure" it was Mother and Father because she saw their faces. The week prior, Maternal Aunt received a text from Mother asking her to pick Mother up at a Circle K gas station. When she arrived, Maternal Aunt saw Mother get out of a similar white car and, in hindsight, believed it was Father, who worked at a Circle K gas station.

DISCUSSION

I.

*Substantial Evidence Supports the Removal Order*

On this record, we disagree with Mother's contention that there was insufficient evidence to support the juvenile court's removal order because reasonable alternatives existed to prevent the children's removal from her custody.

"A child may not be taken from a parent's physical custody during juvenile dependency proceedings, except for a temporary detention period, unless clear and convincing evidence supports a ground for removal specified by the Legislature." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.) Section 361 is the governing statute, and it imposes restraints on the juvenile court's authority to remove a child from a parent's physical custody. (§ 361, subd. (c).) It provides that "[a] dependent child shall not be taken from the physical custody of his or her parents, . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of

11

the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The statute further provides "[t]he court shall consider, as a reasonable means to protect the minor," the option of removing the offending parent from the home (§ 361, subd. (c)(1)(A)), and whether the nonoffending parent "presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm (§ 361, subd. (c)(1)(B)).

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.) The court has broad discretion in selecting a disposition that serves the child's best interests. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

We review a dispositional order removing a child from a parent for substantial evidence, " 'keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.' " (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) In applying this standard of review, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable

12

fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995–996.) We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence. (*Ibid.*) Here, Mother, as the party challenging the juvenile court's order, has the burden to show there is insufficient evidence to support the court's decision. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103.)

As noted, section 361 restrains a juvenile court from removing a child from the physical custody of her parents unless there is clear and convincing evidence of *two* conditions: (1) "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if she is returned home, and (2) "there are no reasonable means by which the [child's] physical health can be protected without removing" her from the parent's physical custody. (§ 361, subd. (c)(1).) Mother does not challenge there was sufficient evidence to support the court's finding that there was or would be substantial danger to D.E. and A.E. if they were returned to her custody.[5] Instead, she contends only that there was insufficient evidence of the second condition.

Specifically, Mother argues there were reasonable protective measures "less drastic" than removing the children from her custody, including an order that Mother reside in the maternal grandparents' home with the

---

[5] The record demonstrated the children's exposure to the pattern of volatility and violence in their parents' relationship was, *at minimum*, emotionally harmful to them. The negative impact on both D.E. and A.E. was evident in the fear they expressed for their own safety and the mental health issues they were exhibiting, including comments by A.E. that arguably suggested thoughts of self-harm.

13

children under the court's supervision, while Father is ordered out of the home. She contends this arrangement, combined with other measures such as unannounced visits, periodic interviews of the children and Maternal Grandmother, and conditioning the placement on Mother not permitting Father to have unsupervised or unauthorized access to the children outside the Agency's scheduled visits, would adequately protect the children from the defined risk of harm—exposure to the parents' pattern of ongoing domestic violence. We are not persuaded.

Mother and Father had a documented history of serious and continuous domestic violence that posed a substantial danger to the children's safety and well-being. Even Mother recognized she needed to "not have [Father] around the home" in order to make it safe for the children to return to her care. She acknowledged the court's "main concern" in the dependency case was "the CPO being broken." Despite articulating this insight, Mother repeatedly and willfully disregarded the CPO and failed to comply with her dependency case plan, which required compliance with *all* court orders. A juvenile court could reasonably determine, based on a parent's prior violations of court orders including a restraining order, that a child could not be safely placed in the parent's custody in the hope the parent would comply with court orders or Agency supervision. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1127.) On appeal, Mother neither admits nor denies having contact with Father in violation of the CPO. She argues instead that "even if this was true," the contact was peaceful with no reported arguments and occurred away from the children. Mother's continuing attempt to excuse the parents' violations of the CPO only further supports the juvenile court's finding that no reasonable alternatives existed to protect the children short of their removal from her custody.

14

Mother's suggestion that removing Father from "the home" was another option to protect the children is also unpersuasive. While the juvenile court is required to consider removal of the offending parent from the home as a reasonable means of protecting a child, Mother's reliance on section 361, subdivision (c)(1)(A), overlooks that, at the time of the contested hearing, Father was living in a car, not in the home with the children. It also overlooks that even after Father had been removed from the home pursuant to the CPO, Father and Mother continued to have contact which resulted in another domestic violence incident on September 27, 2022. This time the violence occurred in the presence of the children and again resulted in injury to Mother.

There is also substantial evidence to support a finding that allowing Mother to live with the maternal grandparents, even with unannounced visits, was not a viable option. In the months before the contested hearing, Mother was taking calculated steps to see Father in secrecy, away from the maternal grandparent's home. Mother's behavior upset Maternal Grandmother. It caused her to lose confidence that Mother was prioritizing the children's safety and she no longer supported Mother's visits with the children in her home.

In sum, we conclude substantial evidence supports the juvenile court's removal order.

## II.

### *Mother Forfeited Her Challenge to the Visitation Order*

Mother contends that if we affirm the removal order, the juvenile court's visitation order must be reversed because it did not set a minimum frequency or duration for her visits and improperly delegated "all judicial

15

authority" over her visits to the Agency.  On this record, we conclude Mother has forfeited this issue.

"Visitation is a necessary and integral component of any reunification plan." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.)  Section 362.1, subdivision (a)(1), provides that visitation "shall be as frequent as possible, consistent with the well-being of the child."  "At the same time, visitation orders must provide for 'flexibility in response to the changing needs of the child and to dynamic family circumstances.' " (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)  "It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility[.]" (*In re S.H.*, at p. 317.)

"A visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.)  However, the discretion to decide whether *any* visitation occurs at all must remain with the court.  When the court abdicates its discretion in that regard and permits a third party, whether social worker, therapist, or the child, " 'to determine whether any visitation will occur, the court impermissibly delegates its authority over visitation and abuses its discretion.' " (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 519; *In re S.H., supra,* 111 Cal.App.4th at pp. 317–318.)

After the juvenile court made its jurisdictional findings, the court invited counsel's positions on the appropriate disposition.  Mother's counsel submitted on the Agency's recommendation that the children remain in Maternal Grandmother's placement and that Mother continue with supervised visitations and not be allowed to live with the children in Maternal Grandmother's home.  Mother did not ask for a more specific in-person visitation order, or that the court specify the frequency or duration of

her visits. Instead, she requested only that "all discretions for expansion be in place." The court so ordered. Mother cannot complain now for the first time on appeal that the court erred in its visitation order by failing to set a minimum frequency or duration for her visits, or by vesting the Agency with discretion to expand her visits. We conclude she has forfeited the claim.[6] (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1528 [argument not raised below is forfeited on appeal]; *In re A.S.* (2018) 28 Cal.App.5th 131, 151 [failure to object in the juvenile court forfeits the issue on appeal].)

_____

[6] Although we conclude Mother has forfeited her challenge to the visitation order, we note that throughout the dependency proceeding, Mother was able to visit with the children regularly except for times she did not show up for her visits. She does not claim, and there is nothing in the record indicating that she was precluded or prevented from visiting the children at any time for any reason, or that this would change going forward. The visitation order here also does not delegate to any party the ability to veto Mother's visits. (Compare with *In re T.H.*, *supra*, 190 Cal.App.4th at pp. 1122–1123 [concluding that ordering the father to have supervised visitation " 'to be determined by the parents' " was an abuse of discretion where the mother, who was the custodial parent had objected to the father having any visitation at all and "could conceivably agree to only one visit a year or less without violating the letter of the court's order"]; and *In re S.H.*, *supra*, 111 Cal.App.4th at pp. 318–319 [where the mother's sons had refused visits and all the children were fearful of the mother, reversing visitation order that stated " 'if the children refuse a visit, then they shall not be forced to have a visit' " because the order granted the children "de facto veto power"].)

## DISPOSITION

The juvenile court's February 10, 2023 jurisdictional and dispositional orders are affirmed.

DO, J.

WE CONCUR:

DATO, Acting P. J.

CASTILLO, J.